# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

RONALD F. HAAS,

      *Plaintiff*,                CASE NO. 2:13-CV-14102-MOB-PTM

*v.*

COMMISSIONER OF          DISTRICT JUDGE MARIANNE O. BATTANI
SOCIAL SECURITY,          MAGISTRATE JUDGE PATRICIA T. MORRIS

      *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

### I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

### II.    REPORT

#### A.    Introduction and Procedural History

This case was referred to Magistrate Judge Patricia T. Morris, *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3), by Notice of Reference to review the Commissioner's decision denying Plaintiff's claims for Disability Insurance Benefits ("DIB") and Supplemental

---

[1] The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008 RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Security Income ("SSI"). This matter is currently before the Court on cross-motions for summary judgment. (Docs. 19, 25.)

Plaintiff Ronald Haas was forty-six years old at the time of the administrative hearing on May 14, 2012. (Transcript, Doc. 15 at 16, 141.) Plaintiff worked as a restaurant manager, as a shift leader in a grocery store, and as an administrator in a vending machine business before his alleged disability onset. (Tr. at 186.) Plaintiff filed his claims for DIB and SSI on October 13, 2010, alleging that he became unable to work on July 31, 2010. (Tr. at 141-49.) The claims were denied at the initial administrative stage. (Tr. at 102.) In denying Plaintiff's claims, the Commissioner considered discogenic and degenerative disorders of the back, and other and unspecified arthropathies. (*Id*.) On May 14, 2012, Plaintiff appeared before Administrative Law Judge ("ALJ") Anthony R. Smereka, who considered the application for benefits *de novo*. (Tr. at 36-69.) In a decision dated June 14, 2012, the ALJ found that Plaintiff was not disabled. (Tr. at 15-35.)

On July 22, 2013, the ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On September 25, 2013, Plaintiff filed the instant suit, seeking judicial review of the Commissioner's unfavorable decision. (Doc. 1.)

### B.    Standard of Review

The Social Security Administration has promulgated the following rules for the administration of disability benefits. *See* 20 C.F.R. §§ 401-422. First, a state agency, acting under the authority and supervision of the Administration, usually makes the initial determination of whether a person is disabled. 20 C.F.R. § 404.1503; *Bowen v. Yuckert*, 482

U.S. 137, 142 (1987). If denied, the claimant may seek review of the state's decision through the Administration's three-stage review process. *Bowen*, 482 U.S. at 142. In the first step of this process, the state's disability determination is reconsidered *de novo* by the state agency. *Id.* Next the claimant has the right to a hearing before an ALJ. *Id.* Finally, "the claimant may seek review by the Appeals Council." *Id.* Only after the Commissioner has issued a final administrative decision that is unfavorable may the claimant file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decisions under 42 U.S.C. § 405(g). This is a limited review where we "'must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (*quoting Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997).

### C.    The ALJ's Five-Step Sequential Analysis

The "[c]laimant bears the burden of proving his [or her] entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994); *accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). While, in general, the claimant "is responsible for providing the evidence" to make a residual functional capacity ("RFC") assessment, before a determination of not disabled is made, the Commissioner is "responsible for developing [a claimant's] complete medical history, including arranging for a consultative examination[] if necessary." 20 C.F.R. § 404.1545(a)(3).

Title II, 42 U.S.C. §§ 401-434, provides DIB to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI, 42 U.S.C. §§ 1381-1385, provides SSI to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . .

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. § 416.905(a). Disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920; *see also Heston v.Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by" an impairment that precludes performance of past relevant work. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003) (cited with approval in *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540 (6th Cir. 2007)). If the analysis reaches step five, the burden shifts to the Commissioner to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citing 20 C.F.R. §§ 416.920(a)(4)(v), 416.920(a)(4)(g)); *see also Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006).

### D.    The ALJ's Findings

The ALJ applied the five-step disability analysis to Plaintiff's claim and found at Step One that Plaintiff met the insured status requirements through December 31, 2015, and had not engaged in substantial gainful activity since July 31, 2010, the alleged onset date. (Tr. at 20.) At Step Two, he found that Plaintiff's conditions of status-post cervical discectomy with fusion, status-post lumbar laminectomy with radiculopathy, bicipital tenosynovitis of the left of the left shoulder, chronic pain syndrome, cervical post-laminectomy syndrome, lumbar post laminectomy syndrome, anxiety, depression, and substance abuse in remission, were "severe" within the meaning of 20 C.F.R. § 404.1520 and § 416.920. (*Id.*) At Step Three, he found that Plaintiff did not have an impairment or combination of impairments that met or was the medical equivalent of a listing in the regulations. (Tr. at 21-23.) At Step Four, he found that Plaintiff could perform unskilled sedentary work with several limitations and was unable to perform any past relevant work. (Tr. at 23.) He also found that Plaintiff was forty-four years old on the application date, putting him into the "younger individual" category of "under age

5

fifty." (Tr. at 65; *see also* 20 C.F.R. § 404.1563(c).) At Step Five the ALJ found that, considering Plaintiff's age, education, work experience and residual functional capacity, there were jobs existing in the economy in significant numbers that Plaintiff could perform, and therefore, found that Plaintiff was not disabled. (Tr. at 29-30.)

### E.   Administrative Record

### 1.   Medical History

Plaintiff saw his primary care physician, Dr. Steven Bishop, from July 31, 2009 to November 18, 2010. (Tr. at 345-91.) On July 15, 2010, Plaintiff saw Dr. Bishop to follow up on his emergency room visit regarding severe left thigh pain the day before. (Tr. at 355.) His gait and heel and toe raises were normal and he had a full range of motion. (Tr. at 356.)  On July 26, 2010, Plaintiff went to Dr. Bishop complaining of left shoulder pain. (Tr. at 363.) On August 2, Plaintiff saw Dr. Bishop again for shoulder pain—he had injured it the day before at work lifting two slicers. (Tr. at 361.) On August 13, 2010, Plaintiff's left shoulder was so sore he could not lift it at all. (Tr. at 349.) He was not wearing his arm sling at this appointment. (*Id.*) On August 2, 2010, Dr. Bishop assessed Plaintiff with a rotator cuff sprain and encouraged him to discontinue the shoulder sling because it was probably contributing to his neck and upper back pain. (Tr. at 262.)

On July 14, 2010, Plaintiff reported a history of "MS, fibromyalgia, chronic back pain, low testosterone, cataract, skin cancer, anxiety, depression, and substance abuse." (*Id.*) He was currently on Xanax, BuSpar, acylclovir, Norco, baclofen, prednisone, "medical marijuana," and testosterone injections. (*Id.*) He had a normal range of motion, but complained "of pain with knee flexion and hip flexion." (Tr. at 296.) He also had decreased strength, but it appeared to be from "decreased effort." (*Id.*) He could stand but limped when he tried to ambulate, he

had good reflexes, normal sensation, and his calves were soft and nontender. (*Id.*) He requested "a big shot of Dilaudid." (Tr. at 298.)  He was given a shot of Dilaudid and Valium. (Tr. at 296.) Plaintiff's leg was negative for deep vein thrombosis and he was pain free upon discharge. (Tr. at 294, 301.)

On August 1, 2010 Plaintiff went to emergency department at Providence Park Hospital complaining about shoulder pain, which had been "reinjured" by lifting a slicer at work the day before. (Tr. at 288.) He had difficulty with an "arm drop" test and his arm was put in a sling because of the possibility of rotator cuff injuries. (Tr. at 287.) Plaintiff reported a history of fibromyalgia and chronic pain symptoms; he also had a history of alcohol/drug abuse, anxiety, and depression. (Tr. at 288, 292.) He had a full range of motion of the elbow, wrist, and fingers. (Tr. at 289.) He had pain with "abduction of the shoulder for flexion and extension." (*Id.*) An x-ray showed "no evidence of fracture, subluxation[,] or other acute abnormality." (Tr. at 293.)

An MRI of the shoulder on August 6, 2010 showed an anterior labral tear and moderate acromioclavicular arthropathy with mild subacromial stenosis. (Tr. at 286.) An MRI of the cervical spine on October 1, 2010 showed degenerative disc disease at C5-C6 and C6-C7 and lateral left-sided herniation interforaminally at L3-L4. (Tr. at 284-85.)

On August 23, 2010, Plaintiff saw Sean F. Bak, M.D., at Poretta Center for Orthopaedic Surgery for his left shoulder injury. (Tr. at 276-83.) An x-ray showed "no evidence of fracture or dislocation. The glenohumeral joint [was] normal. The AC joint [was] normal. The [h]umeral head height [was] normal." (Tr. at 178.) The MRI showed mild rotator cuff tendinitis. (*Id.*) Dr. Bak did not think Plaintiff's shoulder was his main problem. (*Id.*) He

recommended cortisone injection. (*Id.*) He also recommended Plaintiff see someone about his neck. (*Id.*)

Plaintiff underwent physical therapy at Spinal and Orthopedic Rehabilitation from September 15 to October 22, 2010. (Tr. at 318-44.) On October 22, 2010, his pain had not gotten better and his range of motion had not improved. (Tr. at 319.) He had problems with compliance and physical therapy attendance. (*Id.*) Plaintiff walked into the clinic with a normal gait. (Tr. at 326.) His lumbar range of motion was reduced. (*Id.*) His pain limited him from doing most activities of daily living. (Tr. at 333.) His pain seemed to get a little bit better with heat. (Tr. at 337.) He consistently rated his pain as a ten out of ten. (Tr. at 318-44.) As of September 22, 2010, Plaintiff was sometimes using an exercise bike at the gym. (Tr. at 338.)

Plaintiff was treated at Rehabilitation Physicians from September 15, 2010 to October 26, 2010. (Tr. at 512-21.) Plaintiff said that every time he went to physical therapy his symptoms got worse. (*Id.*) He said the cervical epidural only helped for about five days. (*Id.*) Dr. Michael F. Haenick noted that, upon examination, Plaintiff's upper and lower extremities strength was 5/5, his sensation was intact, and his reflexes were symmetrical. (*Id.*) He could stand independently and ambulate throughout the room. (*Id.*) His longstanding pain was compatible with fibromyalgia or long term opioid use. (*Id.*)

On August 26, 2011, Plaintiff had a consultative examination with Walid Nader, M.D. (Tr. at 493-500.) He reported that he had fibromyalgia and "hurt[] all over his body." (Tr. at 493.) He had been using a cane since his May surgery. (*Id.*) His strength was 5/5 in all extremities and his sensation was intact. (Tr. at 494.) He was able to get on and off the examination table, he was not able to squat or walk on his heels or toes, and he was using a clinically indicated cane. (Tr. at 494.) He assessed Plaintiff with a history of anxiety, panic

8

attacks, glaucoma, fibromyalgia, herniated disc disease of the cervical spine, status post

surgery, herniated disc disease of the lumbar spine, status post surgery. (Tr. at 495.) He was

able to among other things, sit, stand, bend, stoop, carry, push, pull, button clothes, tie shoes,

dress-undress, dial telephone, open door, make a fist, pick up coin, pick up pencil, write, get on

and off examining table, climb stairs; he was unable to squat and arise from squatting. (Tr. at

496.) His legs and arms had normal reflexes." (*Id.*) His gait was stable and within normal

limits. (Tr. at 497.) The clinical evidence supported the need for a walking aid to reduce pain

and because he would fall without the cane. (*Id.*)

Plaintiff was treated by Teck Mun Soo, M.D., at Michigan Spine and Brain Surgeons

from October 4, 2010 to February 7, 2011. (Tr. at 401-20.) On December 6, 2010 Plaintiff

consulted with Dr. Soo about his neck pain, bilateral arm pain, back pain, and bilateral leg

pain. (Tr. at 407-08.) His cervical spine range of motion was limited because of pain and his

lumbar range of motion was normal. (Tr. at 408.) Dr. Soo reviewed the MRI from October 1,

2010, (Tr. at 417), which "demonstrated significant left-sided foraminal stenosis at C56 and

C67. There was a disc herniation at C56 and at C67 with mild cord flattening. There was also

evidence of stenosis at L45 and anterolisthesis of L4 on L5 and increasing thoracis kyphosis."

(Tr. at 408.) He recommended surgery and reviewed the risks with Plaintiff. (*Id.*) On January

7, 2011 Plaintiff had an "[a]nterior cervical decompressive discectomy and bilateral

foraminotomy C5-C6 and C6-C7," and an "[a]nterior cervical interbody fusion, C5-C6 and C6-

C7." (Tr. at 403-06.) Postoperative x-rays taken on January 7 showed "plate and screw fixation

from C5 through C7." (Tr. at 411.) There was no subluxation. (*Id.*) At Plaintiff's February 7,

2011 postoperative appointment, Dr. Soo said, "Overall, I am pleased with patient's outcome

after surgery. . . . He may taper down on the use of his Vista collar. I recommend that he avoid

9

heavy lifting or overhead work. . . ." (Tr. at 402.) Plaintiff reported that "he was pleased" with the results of the surgery. (Tr. at 432.)

A postoperative MRI from March 21, 2011 showed "[s]table appearance of the cervical spine when compared to the prior exam. There is fusion anteriorly of C5 through C7. Degrees of neural foraminal narrowing are seen . . . . This is most pronounced on the left C5-C6 and C6-C7." (Tr. at 439.)

Plaintiff saw Dr. Soo for a follow up appointment on April 11, 2011. (Tr. at 453-3.) Plaintiff had been doing well "with regard to his preoperative symptoms" after his January 7 surgery, however "he did report a slight burning sensation in the occiput and high cervical spine, as well as mild bilateral hand paraesthesias." (*Id.*) His primary complaint was "back pain radiating to the right hip with associated pain upon standing." (*Id.*) Dr. Soo noted that the cervical spine x-ray from that day (Tr. at 457) demonstrated a completed fusion, and the lumbar spine x-ray from that day (Tr. at 458) demonstrated "an annular tear at L45 as well as degenerative changes from L2 to S1 with disc bulging. There was evidence of stenosis at L45, an anterolisthesis of L4 on L5, and increased thoracic kyphosis." (Tr. at 453.) This made it likely that Plaintiff would need another surgery for his lumbar symptoms, however Dr. Soo wanted him to "maximize conservative treatment [such as steroid injections] first," and "discontinue his use of nicotine." (Tr. at 453.) Plaintiff returned on April 20, 2011, and Dr. Soo reviewed a CT scan from April 19 (Tr. at 455), which "demonstrated arthritic changes in the lumbar spine[,] . . . an anterolisthesis of L4 on L5 and stenosis at L45[,] [and] a disc herniation at L34 and a left far lateral disc herniation at L45." (Tr. at 450.)

Based on this information and nine months of failed conservative treatment, Dr. Soo recommended a second surgery. (Tr. at 451.) Dr. Soo reviewed the risks of the surgery with

Plaintiff and specifically emphasized the risks of smoking, including failed fusion and delayed wound healing; he stated "[Plaintiff] is to cease smoking immediately and must remain smoke-free for at least one year after surgery." (*Id.*)

On May 4, 2011, Plaintiff had a minimally invasive lumbar laminectomy and fusion from L3 to L6. (Tr. at 465-68.) He had a postoperative appointment on June 4, 2011 where Dr. Soo noted "Overall, I am pleased with patient's outcome after surgery. I recommend he quit smoking." (Tr. at 464.) He was using a cane for ambulation at this visit and his wound was "nicely healed." (*Id.*) On August 4, 2011 Dr. Soo noted "Overall, I am pleased with patient's outcome after surgery. I have prescribed a course of physical therapy at Dynamic Neck and Back. . . . I recommend patient quit smoking." (Tr. at 476-77.) Dr. Soo reviewed the August 4 x-ray of lumbar spine (Tr. at 479) which "demonstrated hardware in good position . . . [and] evidence of bony mass formation in the interspace." (Tr. at 477.)  On July 23, 2011, Plaintiff was referred to physical therapy for "post lumbar fusion for traumatic spondylopathy." (Tr. at 480-84.) On November 4, 2011, Dr. Soo diagnosed Plaintiff with "cervical post-laminectomy syndrome, lumbar post-laminectomy syndrome and discogenic syndrome." (Tr. at 583-86.) X-rays indicated completed fusion from C5 to C7 and from L3 to L5. (*Id.*) Dr. Soo wrote that he "believe[d] that patient has improved from preoperatively. There is no further indication for surgical intervention, as I believe that a significant portion of his pain is muscular in nature." (*Id.*) Plaintiff stated that "physical therapy ha[d] improved his postoperative discomfort in the past." (*Id.*) In light of this, Dr. Soo prescribed another course of physical therapy. (*Id.*)

Plaintiff went to physical therapy at Dynamic Rehabilitation from August 15, 2011 to October 12, 2011. (Tr. at 522-65.) On August 15, 2011 his lower extremity strength was 5/5, his lower extremity sensation was intact bilaterally, he was able to heel walk and toe walk, and

he was able to squat bilaterally. (Tr. at 558.) On August 22, 2011, he stated that since he began home stretching he had "noticed significantly reduced back" symptoms, but no change in leg symptoms. (Tr. at 555.) On September 20, 2011, Plaintiff noted his sleep was disrupted by pain "less than three times per week." (Tr. at 543.) On October 5, 2011, Plaintiff did yardwork the day before and was not relying on a cane as much. (Tr. at 534.) On Monday, October 10, 2011, he noted that he had not used the cane since the previous Thursday, but his pain and stiffness had increased. (Tr. at 529.) On October 12, 2011, Plaintiff was able to carry groceries from the car to the kitchen. (Tr. at 524.)

Plaintiff went to Providence Park Hospital on October 14, 2011 for severe headache and facial numbness. (Tr. at 566-82.) Plaintiff requested Dilaudid or Demerol and became very upset when it was refused—he was instead treated with Toradol IV. (Tr. at 568.) Plaintiff was tender "anywhere that I touched him." (Tr. at 571.)

Plaintiff went to Tri-County Pain Consultants from April 12, 2011 to January 30, 2012; he was treated by Timothy A. Wright, M.D. (Tr. at 599-614.) He received steroid injections on April 12, 2011. (Tr. at 614.) He reported no relief from this injection and did not return to the clinic until November 3, 2011. (Tr. at 609.) He reported at his November 3 appointment that the May 4 surgery "helped significantly" with his posture and improved the pain in his back as well as in his lower extremities. (*Id.*) He completed his physical therapy and continued a home exercise program. (*Id.*) His pain had increased significantly two weeks prior to the November 3 appointment. (*Id.*) His average pain was a seven out of ten. (*Id.*) His gait was unassisted at this appointment. (*Id.*) He had an epidural lysis of adhesions which gave him about nine days of relief. (Tr. at 608-10.) He had another epidural shot on November 17, 2011, from which he had about five days of relief. (Tr. at 607-08.) He had another epidural shot on December 1, 2011,

12

and returned on December 9 "on an urgent basis for reevaluation of chronic neck and low back pain." (Tr. at 603-06.) At his December 15, 2011 appointment his pain level was a seven out of ten. (Tr. at 603.) He was given another epidural, which gave him approximately fifty-percent relief and he decided this was enough relief to successfully wean off of oxycodone. (Tr. at 599.) However his pain subsequently returned. (*Id.*)

Plaintiff saw Dr. Bishop on January 16, 2012, who started him back on the oxycodone. (Tr. at 625.) His gait was stable without difficulty. He was assessed with chronic pain syndrome. (*Id.*) On February 6, 2012 Plaintiff reported that his "pain had improved to the point where [he was] back in the gym but only doing the treadmill." (Tr. at 622.) Emotionally he was feeling less ups and downs. (*Id.*)

Plaintiff was treated by Luis Pomodoros, M.D. from July 30, 2009 to October 19, 2010. (Tr. at 305-17.) The majority of the treatment notes are illegible. Plaintiff complained about anxiety and drug dependency. (Tr. at 305.) He reported a history of anxiety, depression, and substance abuse, spanning back to age fourteen. (*Id.*) He was in an institution from age sixteen to eighteen, where he was sexually abused. (*Id.*) On August 27, 2009, Plaintiff showed "some improvement." (Tr. at 306.) On June 10, 2010, he was feeling more anxious and upset; his Xanax dose was increased. (Tr. at 309.) A note from October 19, 2010 indicates that Plaintiff was terminated from work. (Tr. at 312.)

Plaintiff saw Suzann Kenna, M.A. for a psychological consultative examination on January 25, 2011. (Tr. at 396-400.) He wore a neck brace to the appointment and reported he had been wearing it since his surgery. (Tr. at 397.) He had normal posture and gait (*Id.*) He had problems with panic attacks, anger, and depression. (Tr. at 398.) Plaintiff reported taking Oxycodone for pain and Xanax four times a day; he was drinking alcohol once a week. (*Id.*)

13

Dr. Kenna stated, "It is difficult to diagnose someone who is taking that type/amount of medications and drinking alcohol on top of the med[ications]." (*Id.*) In her opinion, "It [was] doubtful that [Plaintiff] would be able to do work related activities due to his depression, anxiety, [and] pain medications that he is taking. The pain medication along with alcohol exacerbates his depression." (*Id.*) She diagnosed Plaintiff with panic attacks, adjustment disorder with depressed mood, alcohol abuse and dependence, possible anxiolytic abuse, and possible opioid abuse/dependence. (*Id.*) She assessed him with a Global Assessment of Functioning ("GAF") score of forty-five to fifty.[2] (Tr. at 398.) She believed he could be substituting prescription medication for illicit drugs and that he had relapsed and was in denial. (*Id.*) The state agency reviewing physician Kathy A. Morrow, Ph.D., gave this opinion light weight "due to it being based on [Plaintiff's] statements." (Tr. at 95.)

Plaintiff saw James Riggio, Ph.D., from August 21 to October 12, 2011, for his anxiety and depression. (Tr. at 501-11.) Dr. Riggio noted that Plaintiff "enjoys watching television, gardening when he can, and spending time on the computer." (Tr. at 503.) His clinical presentation was "consistent with a diagnosis of Major Depressive Disorder, Recurrent, Severe. It [was] also important to rule out a diagnosis of Post-Traumatic Stress Disorder, Chronic." (*Id.*) He also met criteria for nicotine and cannabis dependence. (*Id.*) There were also concerns about borderline psychopathology. (*Id.*) His GAF score was forty-eight. (*Id.*) Plaintiff had a "constellation of anxiety symptoms" and was "chronically irritable and agitated"—this

---

[2] A GAF score of 45 to 50 indicates "Serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (*e.g.*, no friends, unable to keep a job)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

was "possibly fueled by his use of medication." (Tr. at 506.)  Plaintiff's prognosis was good

with "ongoing treatment and close monitoring of medication." (*Id.*)

Plaintiff was treated at Wentworth and Associates, P.C., from August 23, 2011 to

January 7, 2012. (Tr. at 589-98.) He reported that he thought he was in more control of his

anger issues. (*Id.*) His life partner said he had a greater clarity of thought and confidence lately.

(*Id.*) He was attending a gym at his January 7, 2012 visit. (*Id.*)

### 2.    Function Reports

Plaintiff's partner, Niel Roshoi, completed an adult function report on Plaintiff's behalf

on November 20, 2010. (Tr. at 207-18.) He testified that his fibromyalgia began in the summer

of 2008 and he was treating it with pain medication. (Tr. at 207.) He had to stop work because

of three herniated discs from lifting and from "unsafe work conditions." (*Id.*) He experienced

pain "all the time," no matter if he was sitting, standing, or moving around. (*Id.*) He said his

typical day consisted of mostly sitting and lying down because of extreme pain and that

"[e]ven holding a book or magazine is painful." (Tr. at 208.) Before his condition, he was able

to "work, workout, garden, [and] drive a car." (*Id.*) "Excruciating pain" interfered with his

sleep. (*Id.*) It interfered with his personal care in that he now took more time to dress, he was

afraid of falling so he bathed less, he shaved less often because of the pain in his arm and neck,

and his partner cooked for him. (*Id.*) He was not able to do any housework or yardwork

because of his pain—his partner did this work. (Tr. at 209.)

He only reported going outside for doctor appointments. (Tr. at 210.) He could not go

out alone because he was afraid of injury and incapacitation. (*Id.*) His partner did all the

shopping. (*Id.*) His interests used to include gardening, music, cooking, and watching

television, however cooking and gardening were now too painful after his condition. (Tr. at

15

211.) He spent time with others via phone calls and daily visits "a few times a week." (*Id.*) He indicated that his condition affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, completing tasks, concentration, understanding, following instructions, and using his hands. (Tr. at 212.) He explained, "The herniated discs make physical effort of any kind painful. The medications I am taking blurs my concentration." (*Id.*) He could only walk five minutes before he needed to take a half hour to an hour break, and sometimes a nap. (*Id.*) His medication interfered with his ability to follow written instructions. (*Id.*) He could follow spoken instructions "[w]ell enough, but [he] sometimes ha[d] to have complicated matters made clear." (*Id.*) He got along with authority figures "just fine," he did not handle stress well, he handled changes in his routine "fine, as necessary," and he was scared for his health and his financial situation. (Tr. at 213.) He used an arm sling, ice packs, and heating pads, which he stated were prescribed at the onset of his conditions. (*Id.*) Side effects of his medications included a loss of appetite, difficulties focusing, slight drowsiness, sedation, and fogginess. (Tr. at 214.) He was unable to complete the form because his "arm and hand [we]re affected by the neck pain from the herniated discs." (*Id.*)

Plaintiff's life partner, Niel Roshoi, completed a second adult function report on Plaintiff's behalf, on April 6, 2011. (Tr. at 219-30.) The form mostly mirrored the first. He indicated he helped take care of the dogs by letting them outside. (Tr. at 220.) He needed his partner to help him with bathing and caring for his hair. (*Id.*) He only drove when absolutely necessary. (Tr. at 222.)

### 3.     Plaintiff's Testimony at Administrative Hearing

At the administrative hearing, Plaintiff testified that he had completed high school and three years of college. (Tr. at 40.) He had not worked since July 31, 2010 and continued to

receive unemployment benefits. (*Id.*) He could not go back to work because of his chronic pain and numbness. (Tr. at 47.) The epidural injection treatment only worked for about two days. (*Id.*) His pain went from his fingertips "all the way up [his] arms," up to the back of his neck, into his head, and down his spine into his hips, legs, and feet. (Tr. at 48.) He did not really have any relief from the neck surgery because he was unable to lift his head up without "being in extreme pain." (*Id.*) He said that before the surgery his pain level was a ten out of ten and now it was constantly an eight out of ten. (*Id.*) He maintained this testimony despite a doctor writing that he had "excellent relief with the cervical fusion [surgery]." (Tr. at 48-49.)

The pain from his lower back was worse than the pain from his neck. (Tr. at 49.) The pain was always a "strong" eight out of ten and sometimes was a ten out of ten. (*Id.*) The back surgery did not help the pain level, it only helped by forcing him to lift with his legs. (*Id.*) He estimated the most he could lift was ten pounds, the longest he could sit was fifteen minutes before his legs and buttocks became numb, and that the farthest he could walk about half a block. (Tr. at 49-51.) He was looking for jobs, believing he could perform some of the positions he had applied for if his employer accommodated him—specifically his need to get up and move around periodically. (*Id.*) He also usually needed to lie down around 2:00p.m. every day because sitting at a computer and typing on a keyboard would cause his hands to go numb and "lock up." (*Id.*) Plaintiff's numbness and tingling in his hands was constant throughout the day. (Tr. at 57-58.) He had problems holding onto things: "I'm good for dropping at least one cup of coffee in the morning." (Tr. at 58.) He could tie his shoes but buttoning clothes was challenging. (*Id.*) His pain caused problems focusing—he would have to stop reading after about every other page to refocus. (Tr. at 58-59.) He also had anxiety from

past abuse situations, which caused fear of going outside, fear of being watched, and daily paralyzing panic attacks. (Tr. at 53.)

Plaintiff also had a pending worker's compensation claim. (Tr. at 53-54.) After he moved two slicers at work he was unable to lift his left arm—he later discovered he had a "[labral] tear in [his] left shoulder." (Tr. at 54.) His left arm and shoulder was much weaker than his right. (*Id.*) Plaintiff also had glaucoma in the left eye and was being treated with medicine. (Tr. at 55.) He did not really have any problems with the glaucoma besides needing to avoid night driving. (*Id.*) Plaintiff had not used cocaine for over fifteen years, but was using medical marijuana. (Tr. at 57.)

Plaintiff used a computer at home to search for jobs. (Tr. at 52.) His partner took care of housework and shopping. (*Id.*) When he attempted to do any sort of work that involved standing, his legs would start to spasm and he felt like they would "go out from under [him]." (*Id.*) He exercised, mostly just stretching exercises, on the advice of his physical therapist about three times a week. (Tr. at 59.) He also maintained three gardens. (Tr. at 60.)

### 4.    Vocational Expert Testimony at Administrative Hearing

The ALJ asked the Vocational Expert ("VE"), Kelly Stroker, a series of hypothetical questions based on Plaintiff's age, education, and work experience. (Tr. at 62-69.) The ALJ defined the region as Southeast Michigan. (Tr. at 64.) The first hypothetical individual could perform work at the sedentary level with the following additional restrictions:

> no work at unprotected heights or around moving machinery or other hazards such as sharp objects. Including no work requiring climbing of ladders, ropes, or scaffolds. No more than occasional climbing of ramps or stairs. No work requiring raising the arms above shoulder-level. No more than occasional bending, stooping, kneeling, crouching. Never any crawling.

(*Id.* (sic throughout).) The VE said that the individual would not be able to perform Plaintiff's past work. (*Id.*) However the individual would be able to do other sedentary unskilled work: examples of jobs included, surveillance system monitor (1500 positions regionally, 3000 for the state), assembler (2000 regionally, 4000 for the state), and inspector (2000 regionally, 4000 for the state). (Tr. at 64-65.)

If that individual could not work with the public, there would be no impact on job availability. (Tr. at 65.) If a sit/stand at will option was added, the surveillance system monitor jobs would remain the same, and the assembler and inspector jobs would each be reduced to 1500 for the region and 3000 for the state. (*Id.*) All of her examples were unskilled. (Tr. at 66.) A limitation of "no more than occasional contact with coworkers or supervisors" did not impact the potential job pool. (Tr. at 65.) A limitation restricting the individual from work on conveyor belts, assembly lines, or "that type of production pace in which the pace is set externally," also did not impact the potential job pool. (*Id.*) The VE testified that more than one work absence per month would be work preclusive. (Tr. at 65-66.)

The VE testified that a limitation of "occasional use of the bilateral upper extremities due to frequent peristisis [sic] of both arms and hands," would eliminate the assembler positions. (*Id.*) The need to take an hour and a half nap during the workday would be work preclusive. (Tr. at 67.)

F.     **Governing Law and Analysis**

If the Commissioner's decision applied the correct legal standards and is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. 42

U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006);

*Mullen*, 800 F.2d at 545.

### 1.   Legal Standard

The ALJ determined that Plaintiff had the RFC

> to perform sedentary work as defined in 20 C.F.R. § 416.967(a) but with the following additional limitations: stand and/or walk two hours in an eight-hour workday; sit six hours in an eight-hour workday; requires a sit-stand option at will; lift no more than 10 pounds occasionally and lesser weights more frequently; must avoid unprotected heights and moving machinery; no climbing any ladders, ropes, or scaffolds; no more than occasional climbing of ramps or stairs; no work requiring raising the arms above shoulder level; no more than occasional bending, stooping, kneeling, and crouching; no crawling; unskilled work; no work with the public; and no more than occasional contact with co-workers or supervisors.

(Tr. at 23.)

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 416.967(a).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.   Substantial Evidence

In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *see also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). A reviewing court must consider the evidence in the record as a whole, including any evidence that might subtract from

the weight of the Commissioner's factual findings. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston*, 245 F.3d at 535. There is no requirement that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his [or her] written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999)); *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)); *see also Mullen*, 800 F.2d at 545. Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994); *see also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

### a.   *Hypothetical, RFC, Opinion Evidence, and Credibility Assessment*

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. Both

21

"acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." SSR 06-03p, 2006 WL 2329939, at *2. When "acceptable medical sources" issue these opinions, the regulations deem the statements to be "medical opinions." 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. 20 C.F.R. § 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of this medical opinion evidence, including any treating source opinions that have not been given controlling weight. 20 C.F.R. § 404.1527(c). The ALJ should use the same analysis for "other source" opinions. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2.

Further, an ALJ must give a treating physician's opinions regarding the nature and severity of a claimant's impairments controlling weight when it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) is "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); SSR 96-2p, 1996 WL 374188, at *1-2; *see also Wilson*, 378 F.3d at 544. Matters that are reserved to the Commissioner are not "medical opinions" so they do not receive this deference. 20 C.F.R. § 404.1527(d)(2). Additionally, a physician's notations of a claimant's subjective complaints is the "'opposite of objective medical evidence'" and the ALJ need not give the opinions based solely on those assertions controlling weight. *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)). The regulations also require an ALJ to provide "good reasons" for the weight assigned to the treating source's

22

opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007).

The regulations establish the following two step process for evaluating subjective symptoms, including pain. SSR 96-7p, 1996 WL 374186, at *2; *see also* 20 C.F.R. § 404.1529. First, the ALJ determines "whether there is an underlying medically determinable . . . impairment," that is, "an impairment[] that can be shown by medically acceptable clinical and laboratory diagnostic techniques, that could reasonably expected to produce the individual's . . . symptoms." *Id.* If there is not, then the symptoms "cannot be found to affect the individual's ability to do basic work activities." However, if the symptoms "could reasonably be expected to produce the individual's symptoms," the ALJ moves on to the second step of the process. *Id.* At the second step, the ALJ evaluates the "intensity, persistence, and limiting effects" of the symptoms to determine how much they limit the claimant's "ability to do basic work activities." *Id.* Either a claimant's statements about the intensity, persistence, and limiting effects of his or her symptoms are substantiated by objective medical evidence and the ALJ accepts them, or the ALJ makes a credibility assessment with respect to the claimant's statements to determine the symptom's actual intensity, persistence, and limiting effects. *Id.*; *see also Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986).

While a claimant's description of symptoms alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a), an ALJ may not disregard a claimant's subjective complaints about the severity and persistence of symptoms simply because substantiating objective evidence is lacking. SSR 96-7p, 1996 WL 374186, at

*1. Instead, the absence of confirming objective evidence regarding the severity and persistence of symptoms forces an ALJ to consider these factors:

> (i) . . . [D]aily activities; (ii) The location, duration, frequency, and intensity of . . . pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms; (v) Treatment, other than medication, . . . received for relief of . . . pain or other symptoms; (vi) Any other measures . . . used to relieve . . . pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); *Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. The claimant's work history and the consistency of subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247; *see also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The claimant must provide evidence establishing the RFC: "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most [a claimant] can still do despite his [or

her] limitations," and is measured using "all the relevant evidence in [the] case record." 20

C.F.R. § 404.1545(a)(2). At Step Five, the burden shifts to the Commissioner, who must prove

that "other work exists in the national economy that plaintiff can perform." 20 C.F.R. §§

404.1520, 416.920. "Substantial evidence may be produced through reliance on the testimony

of a [VE] in response to a 'hypothetical' question, but only 'if the question accurately portrays

[Plaintiff's] individual physical and mental impairments.'" *Varley v. Sec'y of Health & Human

Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *Podedworny v. Harris*, 745 F.2d 210, 218

(3d Cir. 1984)). The hypothetical is valid if it includes all *credible* limitations developed prior

to step five. *Casey v. Sec. of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Mich. 1993);

*Donald v. Comm'r of Soc. Sec.*, No. 08-14784-BC, 2009 WL 4730453, at *7 (E.D. Mich. Dec.

2009).

      **b.**    ***Analysis***

              **i.**    *The ALJ's Opinion Evidence Assessments*

Plaintiff constructs what amounts to an argument that the ALJ improperly discounted

Dr. Kenna's opinion that "[i]t [was] doubtful that [Plaintiff] would be able to do work related

activities due to his depression, anxiety, [and] pain medications that he [was] taking." (Tr. at

397); (Doc. 19 at 13-15.)[3]

Plaintiff specifically takes issue (1) with the ALJ not providing any rationale besides the

fact that disability determinations are reserved to the commissioner, and (2) that he discounted

---

[3] Plaintiff actually collaterally attacks the ALJ's assessment of Dr. Kenna's opinion by arguing that the ALJ gave too much weight to a state agency opinion given by Dr. Morrow. (Doc. 19 at 14.) He essentially argues that the ALJ erred because he used some of the same reasons as Dr. Morrow for discounting Dr. Kenna's opinion. Dr. Morrow, gave little weight to Dr. Kenna's opinion because it had been based on Plaintiff's statements. (Tr. at 95.) Fundamentally, Dr. Morrow was not rendering an opinion, but stating her rationale for discrediting Dr. Kenna's opinion. The ALJ made a de novo review of the agency's decision and independently determined the weight to give medical source opinions including Dr. Kenna's and Dr. Morrow's. Nothing in the regulations prevents an ALJ from using a similar rationale as state agencies. Most perplexing here, is that the ALJ did not list among his reasons for discounting Dr. Kenna's opinion that it was based on Plaintiff's subjective complaints. (Tr. at 26-27.)

the low GAF score despite its consistency with the record. (Doc. 19 at 15-16 (quoting *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007) ("While controlling weight will not be provided to a physician's opinion on an issue reserved to the Commissioner, the ALJ still must 'explain the consideration given to the source's opinion(s).'"))).

Plaintiff is correct that "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p, 1996 WL 374183, at *3. However, Plaintiff's first argument fails because the ALJ, in fact provided other rationale: The ALJ "decline[d] to give [Dr. Kenna's] opinion more than a little weight because it was based on one examination," it did not "highlight any specific functional deficits the claimant would encounter," and it was "simply a blanket statement about claimant's inability to work, which is an issue[] reserved to the Commissioner." (Tr. at 27 (citing SSR. 96-5p, 1996 WL 374183, at *2.) The ALJ also discounted the opinion because it considered the side effects of medications, which is outside the scope of a psychiatric examination. (Tr. at 27.)

Next, Plaintiff takes issue with the fact that the ALJ gave less weight to Dr. Kenna's opinion in part because the GAF score she assessed him with, while indicative of severe symptoms, was "not so low to suggest the claimant would be incapable of simple and unskilled work." (Tr. at 27.) Plaintiff argues "the ALJ herein fails to consider ongoing treatment reflective of consistent GAF scores of 48." (Doc. 19 (citing Tr. at 501-10, 594-97).) However, it does not matter how consistent with the record Dr. Kenna's GAF assessment was, because the ALJ found that the low score did not mean that Plaintiff was incapable of work. Since she had opined that Plaintiff could not work, her GAF assessment was relevant, and the ALJ properly considered it in giving her opinion less weight. To the extent that Plaintiff argues that the GAF score is so probative of disability that any contrary finding was in error, any such

26

argument is not persuasive. The Commissioner "has declined to endorse the [GAF] score for 'use in the Social Security and SSI disability programs,' and has indicated that [GAF] scores have no 'direct correlation to the severity requirements of the mental disorders listings.'" *Kennedy v. Astrue*, 247 F. App'x 761, 766 (6th Cir. 2007) (citations omitted). Therefore, any decision not to rely on the GAF score is of little consequence and would not undermine a decision supported by substantial evidence. *See Oliver v. Comm'r of Soc. Sec.*, No. 09-2543, 2011 WL 924688, at *4 (6th Cir. Mar. 17, 2011) (upholding ALJ's decision not to rely on GAF score of 48 because it was inconsistent with other substantial evidence in the record and noting that the "GAF score is not particularly helpful by itself"); *Turcus v. Soc. Sec. Admin.*, 110 F. App'x 630, 632 (6th Cir. 2004) (upholding ALJ's reliance on doctor's opinion that plaintiff could perform simple and routine work despite GAF score of 35).

Later in Plaintiff's brief, in his argument attacking the ALJ's RFC assessment, Plaintiff appears to take issue with the fact that the ALJ discounted Dr. Nader's opinion he "could engage in a variety of tasks, but should not squat due to back pain and would require use of a cane." (Tr. at 493-500). Plaintiff contends that the ALJ impermissibly "'played doctor'" because he constructed the RFC without any opinion evidence and instead concluded that Plaintiff would improve after his examination by Dr. Nader. (Doc. 19 at 15-20) (quoting *Back v. Barnhart*, 63 F. App'x 254, 259 (7th Cir. 2003) ("Typical cases of ALJs impermissibly 'playing doctor' are when they either reject a doctor's medical conclusion without other evidence, or when they draw medical conclusions themselves about a claimant without relying on medical evidence.").)

The ALJ gave Dr. Nader's opinion partial weight, in part because it was issued only three months after Plaintiff's surgery and the ALJ expected Plaintiff's symptoms to improve.

(Tr. at 25.) The ALJ went on to say that "there [was] insufficient information to conclude the claimant's functional capacity would remain this way after a reasonable recovery period, post-surgically, especially because the claimant only started physical therapy on August 5, 2011." (*Id.*) I suggest that substantial evidence supported the ALJ's decision to only give this opinion partial weight. Partially discounting a medical opinion because it fails to take into account the transitory nature of surgery recovery, and "playing doctor" by rejecting the opinion are two completely different things.

For the above reasons and after a review of the record, I suggest that substantial evidence supported the weight that the ALJ gave to Dr. Kenna's and Dr. Nader's opinions.

ii.    *The ALJ's RFC and Credibility Assessments*

As discussed above, Plaintiff argues that "[t]he ALJ came to his physical RFC absent any opinion evidence and played doctor." (Doc. 19 at 17.) However, Plaintiff does not explain what impairments the ALJ should have included in the RFC. Instead, he simply asserts the ALJ lacked opinion evidence for his determination that plaintiff was improving. (*Id.*) Extrapolating from Dr. Nader's opinion above, that Plaintiff "should not squat due to back pain and would require use of a cane," (Tr. at 493-500), Plaintiff seems to argue that the RFC should have included use of a cane and a squatting restriction. However, the burden falls on the plaintiff to provide evidence to establish his or her RFC. 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5.

I suggest that Plaintiff fails to meet his burden to show that his RFC should contain a limitation that he was dependent on a cane for ambulation and was unable to squat. With respect to the cane, evidence in the record shows that he no longer needed a cane. He attempted to go without his cane as early as October 2011, although his pain and stiffness had

28

increased after this attempt. (Tr. at 529.) He was able to carry groceries from his car to the kitchen as of October 12, 2011. (Tr. at 524.) His gait was unassisted again on November 3, 2011. (Tr. at 609.) As of January 16, 2012, his gait was stable without difficulty. (Tr. at 625.) He was using a treadmill by February 5, 2012. (Tr. at 622.) With respect to the squatting limitation, at Plaintiff's physical therapy session on August 15, 2011, Plaintiff's lower extremity strength was 5/5 and he was able to squat. (Tr. at 558.) Further, the ALJ did accommodate Plaintiff's limited mobility in the RFC by limiting Plaintiff to sedentary work with the added limitation of "no more than occasional bending, stooping, kneeling, and crouching." (Tr. at 23.) And the fact that Plaintiff was going to the gym to work out, including some treadmill work, (Tr. at 622), and could maintain three small gardens, (Tr. at 60, 503) shows that he was able to squat occasionally at least.

Plaintiff also makes several attacks at the ALJ's credibility assessment. First he argues that the ALJ erred by discounting Plaintiff's credibility because he received unemployment benefits. (Doc. 19 at 20-21.) Plaintiff quotes a 2006 memorandum from the chief ALJ stating that receipt of unemployment benefits, which generally requires the recipient to affirm his or her ability and willingness to work, is not always inconsistent with a finding of disability. (*Id.*); Memorandum from Chief Judge Frank A. Cristaudo to Regional Offices (Nov. 15, 2006). While the memorandum clearly tilted against undue reliance on this evidence, it also stated that receipt of these benefits was a factor that *must* be considered. Memorandum from Cristaudo, *supra* at 1. Here, the ALJ did not base his credibility or disability determination solely on the fact that Plaintiff collected unemployment benefits. Instead the ALJ noted that Plaintiff "represented himself to the state as being able to work when he applied for and received unemployment benefits . . . [and that] "[w]hile this fact is not determinative of the issue of

29

'disability' . . . it bears negatively on the issue of the claimant's credibility regarding his allegations of disabling impairments." (Tr. at 27-28.) The ALJ went on to consider several other factors that went into his credibility assessment and therefore I suggest, he did unduly rely on the evidence of unemployment benefits in making his credibility assessment.

Plaintiff appears to also argue that the ALJ impermissibly discounted Plaintiff's credibility by considering gaps in treatment without considering the reasons why those gaps existed. (Doc. 19 at 21-22.) He quotes SSR 96-7p, 1996 WL 374186, at *7, which states the ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." He goes on to explain that at times Plaintiff was unable to get treatment because of insurance issues. (*Id.*) Later in his brief Plaintiff asserts that the ALJ erred by relying on the gap in Plaintiff's mental health treatment when making his credibility assessment. (Doc. 19 at 26-27.) However, nowhere in Plaintiff's brief does he point to where the ALJ actually discounted his credibility by considering gaps in his treatment, either for his physical symptoms or his mental symptoms. Further, the ALJ did not list gaps in treatment history as a factor in his credibility assessment. The only place the ALJ even discussed treatment gaps was in an entirely different section when he was reciting facts and noted that Plaintiff missed two appointments in August[4] and that there was no record for treatment by Dr. Pomodoros after October 2010. (Tr. at 26.)Since

---

[4] Presumably Plaintiff would have been insured for these August appointments considering he made it to a third August appointment. (Tr. at 305-17.) Therefore, his insurance issues excuse for not seeking treatment in some situations might not have applied here.

30

the ALJ did not actually consider gaps or intermittent treatment in his credibility analysis, I suggest these arguments do not apply to this case.

Plaintiff next asserts that the ALJ "cherry-picked" evidence by putting too much emphasis on the success of Plaintiff's surgeries and not enough emphasis on the assessment of chronic pain syndrome and the prescriptions of various pain medications to treat the pain. (Doc. 19 at 22-23 (quoting *Smith v. Comm'r of Soc. Sec.*, 2013 WL 943874, at * 6 ("It is generally recognized that an ALJ "may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.")).) However, in the very next sentence of *Smith*, the court points out that "the ALJ does not 'cherry-pick the evidence merely by resolving some inconsistencies unfavorably to a claimant's position." *Smith*, 2013 WL 943874, at *6.

Here, the ALJ listed among many other reasons for discounting Plaintiff's credibility,[5] the fact that there are many statements in the record regarding the success of Plaintiff's surgery. (Tr. at 28.) The record supports this assessment; it contains statements both from Dr. Soo and Plaintiff about the surgery being successful. (Tr. at 402, 432, 464, 476-77, 609.) Furthermore, the ALJ did not completely ignore Plaintiff's statements, or other evidence of Plaintiff's pain. For example, he found that "[d]espite complaining of severe pain, the record contains evidence that contradicts the claimant's allegations. For example, the claimant walked with a stable gait without the use of an assistive device in February 2012 . . . He also admitted he was able to exercise at his gym." (Tr. at 28.) The ALJ went on and noted that Plaintiff "also admitted that he could perform a variety of activities that would be inconsistent with a

_____

[5] The ALJ explicitly considered Plaintiff's receipt of unemployment benefits, his statements about the success of Plaintiff's surgeries, contradictions between the record and Plaintiff's statements, and the efficacy of treatment in reducing symptoms. (Tr. at 27-29.)

31

determination of disability. For example, the claimant testified he is able to use a computer to job search, despite complaining of parestesias at the hearing." (*Id.*) Again the ALJ's conclusions are borne out in the record. In fact, Plaintiff admitted to Dr. Riggio that he enjoyed spending time on the computer in October, 2011. (Tr. at 503.) I suggest, therefore, that the ALJ was not cherry-picking facts, but was merely resolving inconsistencies.

Plaintiff also takes exception to the ALJ having interrupted him midsentence in the administrative hearing as he was trying to explain that he only went to the gym to do physical therapy exercises. He quotes *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) for the proposition that the administrative hearing is non-adversarial and "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." (Doc. 19 at 24.) It may have been rude of the ALJ to cut off Plaintiff, but that does not mean he failed to investigate relevant facts. The ALJ likely decided that he had all the relevant information from this line of inquiry and moved on. Plaintiff had already clarified that he was mostly doing stretching exercises while at the gym. (Tr. at 59.) Furthermore, Plaintiff's lawyer was present at the hearing and asked Plaintiff several follow up questions, (Tr. at 57-59), but Plaintiff did not take the opportunity to clarify his trips to the gym at this time.

### G.    Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

32

## III.   <u>REVIEW</u>

Rule 72(b)(2) of the Federal Rules of Civil Procedure states that "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 155; *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 950 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). According to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date: January 29, 2015                    /S PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge